UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                  :

In Re:                         :

                                  :       Chapter 11

GRUMMAN OLSON INDUSTRIES, INC.,  :
RODNEY GABLE,               :       Case No. 02 B 16131 (SMB)

                                  :

                    Debtor,   :       Adversary No. 10-03052
-----------------------------------------------------  :

                                  :

MORGAN OLSON L.L.C.,         :

                                  :

             Plaintiff-Appellant,   :

                                :       11 Civ. 2291 (JPO)

           -v-                     :

                                :

DENISE FREDERICO and JOHN FREDERICO,  :      MEMORANDUM

                                :         AND ORDER

             Defendants-Appellees.   :

                                :
----------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      This bankruptcy appeal requires the Court to address a question that has not been

resolved by the courts in this Circuit, but has been addressed by courts in several other circuits:

whether a bankruptcy sale order, pursuant to Section 363 of the Bankruptcy Code (the "Code"),

11 U.S.C. § 363, can extinguish the state law claims of third parties based on conduct by the

debtor before the bankruptcy, where no injury was caused until after the bankruptcy closed.

Because these claimants could not have received notice or an opportunity to participate in the

bankruptcy proceedings, the Court holds that enforcing the bankruptcy court's orders to take

away their right to bring a claim would violate bankruptcy procedure and due process.

      Presently before the Court is an appeal pursuant to 28 U.S.C. § 158(a) from an order of

the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") granting a

motion for summary judgment by Appellees Denise Frederico and John Frederico (collectively,

the "Fredericos"), denying a motion for summary judgment by Appellant Morgan Olson L.L.C. ("Morgan"), and dismissing the adversary action brought by Morgan in the Bankruptcy Court. *See In re Grumman Olson Indus.*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) ("*BR Ct. Op.*"). Morgan brought the adversary action for declaratory and injunctive relief barring the Fredericos from proceeding against Morgan in New Jersey state court on theories of successor liability.

For the reasons that follow, the Court affirms the order of the Bankruptcy Court in full.

## I.     Background

The material facts in this case, as set forth in the Bankruptcy Court's opinion, are not in dispute.

### A.     The Parties

Appellant, Morgan, is a corporation engaged in the manufacture of products for the truck body industry.  Morgan purchased certain assets of Grumman Olson Industries, Inc. ("Grumman" or the "Debtor") after Grumman declared bankruptcy.

Appellees, the Fredericos, initiated an action in New Jersey Superior Court against (*inter alia*) Morgan for personal injury and products liability after Denise Frederico was injured after the bankruptcy while driving a truck that was manufactured by Grumman prior to the bankruptcy.

### B.     The Bankruptcy and Sale Order

On December 9, 2002, Grumman, a company that designed, manufactured, and sold products for the truck body industry, filed a petition for Chapter 11 bankruptcy.  On July 1, 2003, the Bankruptcy Court entered an Order approving the sale of certain of the Debtor's assets (the "Lot 2 Assets") to MS Truck Body Corp., a predecessor of Morgan (collectively, "Morgan"), pursuant to Bankruptcy Code §§ 363 and 365.  (*See* Order Pursuant to Sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 (I) Approving the Sale by the

Debtor of Certain of its Operating Assets, Free and Clear of Liens, Claims and Encumbrances, (II) Approving the Assumption and Assignment by the Debtor of Certain Associated Executory Contracts and Unexpired Leases, and (III) Granting Other Related Relief, Appellant's Memorandum of Law in Support of Its Appeal ("Appellant Mem."), Ex. A (Dkt. No. 9) (the "Sale Order").)

The Sale Order contained several provisions that purported to limit Morgan's potential liability arising from the sale of the assets for tort claims based on allegedly defective products manufactured and sold by Grumman prior to the sale.  In particular, the sale of the Lot 2 Assets was ordered "free and clear of all . . . claims . . . and other interests . . . and all debts arising in any way in connection with any acts of the Debtor."  (Sale Order ¶ Q; *accord id.* ¶¶ 4, 14.)  In addition, the Sale Order provided that the purchase of the assets by Morgan would not subject Morgan to "any liability for claims against the Debtor or the Lot 2 Assets, including, but not limited to, claims for successor or vicarious liability, by reason of such transfer under the laws of the United States, any state, territory or possession thereof or the District of Columbia applicable to such transactions."  (Sale Order ¶ 19; *accord* ¶ S (providing that the purchaser "shall not by virtue of this Order or the Lot 2 [Asset Purchase Agreement ("APA")] or the transactions contemplated hereunder or thereunder, be deemed to have 'successor' liability or responsibility for claims against or obligations of the Debtor arising prior to or as a result of the purchase and sale of the Lot 2 Assets hereunder").[1]

---

[1] The relevant provisions of  the Sale Order provide, in full:

Paragraph Q:

The sale, conveyance, and assignment of the assets to be purchased under the Lot 2 APA (the "Lot 2 Assets") shall be free and clear of all liens, claims, encumbrances, and other interests, including without limitation, mortgages, security interests, pledges, liens, replacement liens, judgments, demands, encumbrances, or charges of any kind or nature, if any, including, but not limited to, any restriction on the transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to as "Liens"), and all debts arising in any way in connection with any acts of the debtor, claims (including but not limited to "claims" as that term is defined in the

The Sale Order also provided that the Bankruptcy Court would retain jurisdiction "to interpret, implement and enforce the provisions" of the Sale Order.  (Sale Order ¶ 20.)

On October 31, 2005, the Debtor and the Official Committee of Unsecured Creditors confirmed a joint liquidating plan.  The Court signed the Final Order and Decree on December 29, 2006, thereby closing the bankruptcy proceedings.

### C.      The New Jersey Action

Prior to the bankruptcy filing, the Debtor manufactured and sold truck chassis to various companies, including FedEx.  On October 8, 2009, the Fredericos brought a personal injury action against Morgan and others in New Jersey Superior Court.  The complaint alleges that Ms. Frederico, an employee of FedEx, sustained injuries when the FedEx truck she was driving struck a telephone pole on October 15, 2008.  (*See* Appellant Mem. Ex. B.)  The complaint also

---

Bankruptcy Code), obligations, demands, guaranties, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this Chapter 11 case, and whether imposed by agreement, understanding, law, equity, or otherwise (the foregoing collectively referred to as "Claims"), with all such Liens and Claims, and any and all other interests to attach to the proceeds of sale of, and with the same force, effect and priority of such Liens, Claims and other interests had against, the Lot 2 Assets, and holders thereof shall be permanently enjoined from asserting against the Lot 2 Assets and the and [*sic*] shall look solely to the proceeds of sale.

Paragraph S:

Except as otherwise expressly provided by the Lot 2 APA and all related instruments, the Purchaser shall not by virtue of this Order or the Lot 2 APA or the transactions contemplated hereunder or thereunder, be deemed to have "successor" liability or responsibility for claims against or obligations of the Debtor arising prior to or as a result of the purchase and sale of the Lot 2 Assets hereunder.

Paragraph 19:

Except as otherwise expressly provided in the Lot 2 APA or related instruments or as otherwise provided in this Order, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Lot 2 Assets other than for the purchase price payable under the Lot 2 APA.  Without limiting the effect of the foregoing, the transfer of the Lot 2 Assets and the assignment of the Lot 2 Contracts do not and will not subject the Purchaser to any liability for claims against the Debtor or the Lot 2 Assets, including, but not limited to, claims for successor vicarious liability, by reason of such transfer under the laws of the United States, any state, territory or possession thereof or the District of Columbia applicable to such transactions.  The Purchaser shall not be deemed, as a result of SMB 7/1/03 the consummation of the transaction contemplated by the Lot 2 APA to: (a) be the successor of the Debtor; (b) have, de facto or otherwise, merged with or into the Debtor; (c) be a mere continuation or substantial continuation of the Debtor or the enterprise of the Debtor; or (d) be responsible for any liability of the Debtor or for payment of any benefit accruing to the Debtor, except as specifically provided for in the Lot 2 APA.

alleges that the truck she was driving was manufactured, designed, and/or sold by Grumman in 1994 and was defective for several reasons. On April 28, 2010, the Fredericos filed an amended complaint that alleged that Morgan continued Grumman's product line, and was therefore liable to the Fredericos under New Jersey successor liability law.

### D.     This Adversary Proceeding

On March 24, 2010, Morgan brought this adversary proceeding in the Bankruptcy Court seeking declaratory and injunctive relief barring the Fredericos from bringing their claims against Morgan in New Jersey state court. Morgan's complaint alleged that the Sale Order and accompanying Asset Purchase Agreement "provided that the assets of the debtor would be sold and purchased without liability for products manufactured prior to the sale, including without liability under any state law successor liability theory." (Complaint, 10-3052 (Bankr. S.D.N.Y. Mar. 24, 2010) (Dkt. No. 1) ("Comp.") ¶ 8.) The truck involved in the accident was manufactured by Grumman, not Morgan, and so, the Complaint alleged, Morgan could not be held liable for any damage caused by any alleged defects in that truck. (*Id.* ¶¶ 13-17.) The parties cross-moved for summary judgment. As the Bankruptcy Court explained, the parties dispute "whether Grumman had a role in designing, manufacturing or selling the FedEx truck at issue," but this factual dispute, "though critical to the question of Morgan's potential liability, is immaterial to the resolution of the meaning of the Sale Order. Instead, the motions present a straightforward, threshold legal question: does the Sale Order exonerate Morgan from liability to the Fredericos?" *BR Ct. Op.*, 445 B.R. at 247. The Bankruptcy Court answered this question in the negative, denying Morgan's motion for summary judgment and granting the Fredericos' motion for summary judgment dismissing Morgan's complaint. This appeal followed.

## II.     Discussion

### A.     Jurisdiction and Standard of Review

The Bankruptcy Court assumed jurisdiction to hear this adversary action pursuant to its power to interpret and enforce its own prior orders, specifically the Sale Order.  *BR Ct. Op.*, 445 B.R. at 247-48 (citing *Travelers Indem. Co. v. Bailey*, -- U.S. --, 129 S. Ct. 2195, 2205 (2009); *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223 (2d Cir. 2002)). Under 28 U.S.C. § 158(a), district courts have jurisdiction to hear appeals from the final judgments of bankruptcy judges.

Under Rule 8013 of the Federal Rules of Bankruptcy Procedure,

> On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

 Fed. R. Bankr. P. 8013.  "A bankruptcy court's conclusions of law, by contrast, are reviewed de novo."  *In re Adelphia Comm. Corp.*, 367 B.R. 84, 90-91 (S.D.N.Y. 2007) (citation omitted).

The Bankruptcy Court's decision here granted the Fredericos' motion for summary judgment and denied Morgan's motion for summary judgment.  Under the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]

The material facts in this case are not in dispute, and the Bankruptcy Court did not make any factual findings.  Instead, the appeal presents a pure question of law as to the interpretation

---

[2] Under Rule 7056 of the Federal Rules of Bankruptcy Procedure, a bankruptcy court is to apply Rule 56 of the Federal Rules of Civil Procedure in adversary proceedings.

and enforcement of the Sale Order.  Thus, the Court reviews the Bankruptcy Court's decision *de novo*.

**B.**    **Successor Liability**

It is undisputed that Grumman, not Morgan, manufactured the truck involved in the accident that injured Denise Frederico.[3]  The Fredericos brought suit against Morgan under a theory of successor liability.

Under traditional common law, including the law of this state, "a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006).  Courts have traditionally crafted specific exceptions to this rule where "(1) the successor corporation expressly or impliedly agrees to [assume the liabilities of the predecessor entity], (2) the transaction may be viewed as a de facto merger, (3) the successor is the mere continuation of the predecessor, or (4) the transaction is fraudulent."  *Id.* at 205; *see also Lefever v. K.P. Hovnanian Enters., Inc.*, 160 N.J. 307, 310, 734 A.2d 290 (N.J. 1999).

The New Jersey Supreme Court has also applied a "product-line" exception to the general rule against successor liability.  Under this exception, "by purchasing a substantial part of [a] manufacturer's assets and continuing to market goods in the same product line," the purchasing company can be held liable as a successor for defects in the predecessor's products.  *Lefever*, 160

---

[3] Although this was apparently a disputed issue on the motion for summary judgment before the bankruptcy court, *see BR Ct. Op.*, 445 B.R. at 247, as the Fredericos point out, Morgan alleged in its own Complaint that the truck at issue was "manufactured and sold by the debtor."  (*See* Memorandum of Law for Appellees Denise and John Frederico in Opposition to Appeal from Decision of the Bankruptcy Court by Appellant Morgan Olson, L.L.C. (Dkt. No. 10) ("Appellee Mem.") at 5 (citing Comp. ¶ 13).)  If facts emerge that cast doubt on whether the Debtor, in fact, manufactured the truck that Denise Frederico was driving, that will likely affect whether Morgan will be held liable by a New Jersey court, but it does not affect the Court's analysis of the legal issue.  Given that Morgan appears to assume, for the sake of this appeal, that the Debtor did, in fact, manufacture the truck, the Court will do the same.

N.J. at 310, 734 A.2d 290; *Ramirez v. Amsted Indus. Inc.*, 86 N.J. 332, 431 A.2d 811 (N.J. 1981).[4]

In *Lefever v. K.P. Hovnanian Enterprises, Inc.*, the New Jersey Supreme Court held that the product-line exception first set forth in *Ramirez*, 86 N.J. 332, 431 A.2d 811, applied even where the purchaser obtained the assets pursuant to a sale order in a bankruptcy proceeding where the order purported to transfer the assets free and clear of any claims against them. 160 N.J. at 316-18, 734 A.2d 290. The court considered whether supremacy and preemption principles prevent imposition of state successor liability, and concluded that they do not, unless the bankruptcy court "dealt with" the claims at issue. *Id.* at 316. If the claims were "dealt with" by the bankruptcy court, then the supremacy of federal law in the area of bankruptcy would preempt claims under the state theory of successor liability. *Id.*

The Fredericos argue that Morgan is liable under New Jersey successor liability law because it continued to manufacture and market the same product line and actively exploited the good will in the Grumman Olson name.[5] Further, the bankruptcy court did not "deal with" the Fredericos' claims (because they did not yet exist), so, under *Lefever*, there would be no bar to the imposition of successor liability.

### C.    Preemption

Morgan argues that this case turns on whether the New Jersey Supreme Court had the power to rule as it did in *Lefever*, given federal preemption in the field of bankruptcy.

---

[4] Although this approach to successor liability was rejected as too expansive by the drafters of the *Restatement (Third) of Torts*, an academic article quoted by the New Jersey Supreme Court stated that, as of 1998, "thirteen jurisdictions, representing 43 percent of the United States' population, follow[ed] either the product line approach or the continuity of enterprise approach." *Lefever*, 160 N.J. at 315 (quoting Richard L. Cupp, Jr., *Liability of Successor for Harm Caused by Defective Products Sold Commercially by Predecessor*, 8 Kan. J.L. & Pub. Pol'y 113, 114 (1998)).
[5] For example, Morgan's promotional materials list Jimmy Olson, who founded Grumman Olson, as its own founder, and state that that the company has been "Building the Best . . . since its inception more than 60 years ago," a reference to the founding of Grumman Olson, and not Morgan, which was created eight years ago.  (Appellee Mem. at 6.)

Under the Constitution, federal law "shall be the supreme Law of the Land . . . any Thing in the Constitutions or Laws of any State to the contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Article I of the Constitution reserves for Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. Art. I, § 8.

Courts have long recognized "[t]he exclusive authority of Congress and the federal courts to pass and enforce the bankruptcy laws." *In re Old Carco LLC*, 442 B.R. 196, 207 (S.D.N.Y. 2010) (citing *Int'l Shoe v. Pinkus*, 278 U.S. 261, 263-64 (1929) ("A state is without power to make or enforce any law governing bankruptcies that impairs the obligation of contracts or . . . conflicts with the national bankruptcy laws.")). There is little question that, broadly speaking, federal bankruptcy law preempts state tort law. The bankruptcy code itself provides for an automatic stay of all state proceedings against the debtor. *See* 11 U.S.C. § 362. Courts in this district have held that federal preemption in the field of bankruptcy extends to orders of the bankruptcy courts, which are vested "with authority to implement the federal statutory scheme" by the Bankruptcy Code. *Old Carco*, 442 B.R. at 209 (holding that principles of preemption preclude application of state car dealership franchise laws that conflict with orders issued by court in bankruptcy proceedings).

Morgan argues that the type of successor liability authorized by the New Jersey Supreme Court in *Lefever* tramples on the supremacy of federal bankruptcy law. In particular, Morgan argues that imposing successor liability here is in direct conflict with the Sale Order—an order from a federal bankruptcy court—which provided that Morgan would not be subject to successor liability under the laws of any state. (*See* Sale Order ¶ 19.) Moreover, the imposition of successor liability in this context would effectively defeat the possibility of selling debtor assets "free and clear" of the liabilities of the debtor, which would inevitably result in purchasers' being unwilling to pay as much for those assets. This would run counter to one of the core policies of

the Code in general, and Section 363 of the Code in particular, of "maximizing the value of the bankruptcy estate." *Toibb v. Radloff*, 501 U.S. 157, 163 (1991).

Although the New Jersey Supreme Court's decision in *Lefever* grappled with interesting questions about the intersection of state tort law and bankruptcy law, the validity of the New Jersey court's holding in *Lefever* was not decided by the Bankruptcy Court and is not properly before this Court. This case does not turn on whether there will ultimately be successor liability under New Jersey law, or whether *Lefever* was correctly decided. In fact, the case does not actually require the Court to resolve a conflict between state law and federal bankruptcy law at all. Rather, the case presents the more basic question whether enforcement of the Sale Order in the manner advocated by Morgan is consistent with Bankruptcy Code procedure and due process.

At oral argument, counsel for Morgan argued that the due process problem is only created by virtue of the New Jersey Supreme Court's erroneous decision in *Lefever*, but this is not so. The Court would be faced with this question even if the New Jersey Court had never decided *Lefever*. The basis for successor liability here—"product-line" successor liability—was not created in *Lefever*; it dates back over thirty years to the New Jersey Supreme Court's decision in *Ramirez*, 86 N.J. 332, 431 A.2d 811. *Lefever* merely clarified the New Jersey courts' application of *Ramirez* when the purported successor obtained the assets of the predecessor in a bankruptcy sale.

The present case actually turns on the question whether, assuming *arguendo* that there is a viable basis for state successor liability based on prepetition conduct of the debtor, a bankruptcy court's sale order may be enforced to extinguish those claims where no injury occurred to the claimant until after the bankruptcy closed, such that the claimant was not provided with notice of, or an opportunity to participate in, the bankruptcy proceedings that gave

rise to that order.  The Court does not address whether *Lefever* will ultimately be applied by New Jersey courts to find that Morgan is liable as a successor in the Fredericos' case.  Instead, the Court rules only on whether the Sale Order prevents the Fredericos from pursuing the case at all.

**D.    Applicable Law Regarding the Effect of "Free and Clear" Sale Orders**

**1.    "Free and Clear" Provisions Generally**

The Sale Order in this case provided for a sale free and clear of interests in the property, claims against the debtor, or any successor liability by virtue of the transfer of the assets.  The court authorized this sale pursuant to Section 363 of the Bankruptcy Code, 11 U.S.C. § 363 ("Section 363").  That section empowers the trustee to sell the debtor's assets "free and clear of any interest in such property of an entity other than the estate." 11 U.S.C. § 363(f).[6]  The trustee may do so only "after notice and a hearing." 11 U.S.C. § 363(b).

Although the text of the statute expressly refers only to interests in the property itself, it is now generally agreed—including in this Circuit—that this provision may more broadly extinguish claims that "arise from the property being sold."  *In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009) (quoting *In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003)), *vacated as moot sub. nom. Ind. State Police Pension Tr. v. Chysler LLC*, -- U.S. --, 130 S.Ct. 1015 (2009).  In other words, Section 363(f) "can be used to sell property free and clear of claims that could otherwise be assertable against the buyer of the assets under the common law

---

[6] Section 363(f) provides, in full, that:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

doctrine of successor liability."  George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process*, 76 Am. Bankr. L.J. 235, 267 (2002) (describing this as the "dominant interpretation") (cited in *Chrysler*, 576 F.3d at 124).

The court's power under Section 363 to authorize sales of assets "free and clear" of claims is related to the provision in the Code that the confirmation of a plan of reorganization renders the "property dealt with by the plan . . .  free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."  11 U.S.C. § 1141(c).  In *Chrysler*, the parties objecting to entry of a sale order argued that the fact that Section 1141(c) contains the terms "interests" and "claims," but Section 363 mentions only "interests," meant that Congress "was willing to extinguish tort claims in the reorganization context, but unwilling to do so in the § 363 sale context," particularly because "reorganization provides unsecured creditors procedural rights that are not assured in a § 363(b) sale."  576 F.3d at 125.  The court rejected this argument, holding that, "[g]iven the expanded role of § 363 in bankruptcy proceedings, it makes sense to harmonize the application of § 1141(c) and § 363(f) to the extent permitted by the statutory language."  *Id.*[7]

As the Bankruptcy Court explained here, the policy behind this broader reading of Section 363 is twofold.  First, allowing tort claimants to sue Section 363 purchasers directly— rather than seeking relief from the estate itself—would subvert the Bankruptcy Code's priority scheme, by allowing a low-priority, unsecured claim to leapfrog over other creditors in the bankruptcy.  *See Trans World Airlines*, 322 F.3d at 291-92.  Second, allowing sales of debtor assets free and clear of liabilities of the debtor induces a higher sale price for the assets, thereby

---

[7] Although the *Chrysler* opinion was later vacated as moot on instruction from the Supreme Court, courts in this Circuit have continued to apply this broader conception of the "free and clear" provisions of Section 363 sales.  *See In re Motors Liquidation*, 428 B.R. 43, 57-58 (S.D.N.Y. 2010).

maximizing the value of the estate and maximizing potential recovery to creditors.  *See Chrysler*, 576 F.3d at 126; *Douglas v. Stamco*, 363 F. App'x 100, 102-03 (2d Cir. 2010).

The Sale Order's "free and clear" provisions are consistent with this line of cases. However, the question remains whether the order can be applied to extinguish the claims in this case.

### 2.    Dealing With "Future Claims" in Bankruptcy Generally

This case ultimately turns on the potential reach of a Section 363 "free and clear" sale order to extinguish a claim against a purchaser that is based on pre-bankruptcy conduct of the debtor that did not cause any harm to an identifiable claimant until after the bankruptcy closed. (For the sake of simplicity, the Court will refer to this type of claim as a "future claim," and holders of this type of claim as "future claimants.")  This requires the Court to examine the treatment of future claims in general in bankruptcy proceedings.

Many of the decisions evaluating the effect of bankruptcy court orders on future claims arise outside the Section 363 sale context, and instead turn on the scope of the term "claim" itself in the bankruptcy context, and the degree to which those future claims could be considered "claims" discharged in the bankruptcy.  If a particular cause of action does not fall under the definition of "claim," then, for example, it would fall outside the Code provision that "property dealt with by the plan [of reorganization] is free and clear of all *claims*."  11 U.S.C. § 1141(c) (emphasis added).

The Code defines "claim" as broadly as possible, as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  *See Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) ("Congress intended by this language to adopt the broadest available definition of claim.").  As the Second Circuit has

explained, "Congress unquestionably expected this definition to have wide scope" so that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." *In re Chateuagay Corp.*, 944 F.2d 997, 1003 (2d Cir. 1991) (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 309 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6266).

Despite the breadth of the term "claim" under the Code, problems arise when classifying future claims as "claims" to be dealt with in a bankruptcy. The Second Circuit aptly illustrated these difficulties with a hypothetical:

> Consider, for example, a company that builds bridges around the world. It can estimate that of 10,000 bridges it builds, one will fail, causing 10 deaths. Having built 10,000 bridges, it becomes insolvent and files a petition in bankruptcy. Is there a "claim" on behalf of the 10 people who will be killed when they drive across the one bridge that will fail someday in the future? The potential victims are not only unidentified, but there is no way to identify them. Sheer fortuity will determine who will be on that one bridge when it crashes. What notice is to be given to these potential "claimants"?

*Id.*

In *Chateaugay*, the Second Circuit was determining the applicability of a bankruptcy court's discharge of "claims" to claims for the cost of cleaning up hazardous waste that had been released by the debtor before the bankruptcy proceedings, but which costs would continue to be incurred by the Environmental Protection Agency ("EPA") after the bankruptcy closed. *Id.* at 1002. The court expressly declined to resolve the hypothetical it had posited:

> We need not decide how the definition of "claim" applies to tort victims injured by pre-petition conduct, especially as applied to the difficult case of pre-petition conduct that has not yet resulted in detectable injury, much less the extreme case of pre-petition conduct that has not yet resulted in any tortious consequence to a victim.

14

*Id.* at 1004.  Instead, the court held that the unincurred cleanup costs could be dealt with as "claims" in the bankruptcy because the relationship between the EPA and the debtor was "far closer than that existing between future tort claimants totally unaware of injury and a tort-feasor."  *Id.* at 1005.

Generally, courts have held that future claims cannot be considered "claims" that are dealt with and discharged by a confirmation plan.  For example, in *Lemelle v. Universal MFG. Corp.*, the Fifth Circuit held that "even the broad definition of 'claim' cannot be extended to include . . . claimants whom the record indicates were completely unknown and unidentified at the time [the debtor] filed its petition and whose rights depended entirely on the fortuity of future occurrences."  18 F.3d 1268, 1277 (5th Cir. 1994); *see also Taylor v. Strongbuilt Int'l, Inc. (In re Strongbuilt)*, Nos. 03-31317, 09-3006, 2009 WL 5873047, at *4 (Bankr. W.D. La. Aug. 26, 2009) ("While the codal definition for 'claim' is intended to be broad, it does not go so far as to define claim as 'existent or non-existent'. . . .").

The Eleventh Circuit has provided the clearest articulation of the test used by courts that hold that future claims cannot be adjudicated as "claims" during a bankruptcy:

> [A]n individual has a § 101(5) claim against a debtor manufacturer if (i) events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product; and (ii) the basis for liability is the debtor's prepetition conduct in designing, manufacturing and selling the allegedly defective or dangerous product.  The debtor's prepetition conduct gives rise to a claim to be administered in a case only if there is a relationship established before confirmation between an identifiable claimant or group of claimants and that prepetition conduct.

*Epstein v. Official Committee of Unsecured Creditors of the Estate of Piper Aircraft Corp'n (In re Piper Aircraft Corp.)*, 58 F.3d 1573, 1577 (11th Cir. 1995).  This was the test applied by the Bankruptcy Court here.  *See BR Ct. Op.* 445 B.R. at 252-53.  Although the Second Circuit has never embraced the *Piper* test, the basic approach articulated in *Piper* is consistent with the

Second Circuit's holding in *Chateaugay*, which required a pre-confirmation relationship between the claimant and the debtor before the claimant could have its claims dealt with in the bankruptcy. *See* 944 F.2d at 1004-05.

As the Second Circuit suggested in *Chateaugay*, the concern that underlies these decisions about the scope of the term "claim" is "the enormous practical and perhaps constitutional problems [that] would arise" from treating future claims like "claims" in a bankruptcy. *Id.* at 1003. In particular, as the court noted in posing the "bridge" hypothetical, "What notice is to be given to these potential 'claimants'?" *Id.* at 1003. *Cf. In re Kewanee Boiler Corp.*, 198 B.R. 519, 534 (Bankr. N.D. Ill. 1996) (reviewing cases and stating that "[t]he proper definition of 'claim' was found to be inextricably tied to due process and notions of fundamental fairness"). As the Bankruptcy Court for the Eastern District of Arkansas pointed out in *In re Hoffinger Industries*, the Code "does not define 'claim' from the chapter 11 debtor's perspective as an 'obligation to pay'" but rather as a "right to payment": "Viewed from the correct perspective, the focus must be on identifying that other party [holding the 'right to payment'] and protecting his or her due process rights." 307 B.R. 112, 117 (Bankr. E.D. Ark. 2004); *see also In re Piper Aircraft Corp.*, 162 B.R. 619, 628 (Bankr. S.D. Fla. 1994) (noting that "significant and possibly insurmountable due process problems exist in providing notice to [a] vast class of Future Claimants sufficient to allow the discharge of their claims"), *aff'd*, 168 B.R. 434 (S.D. Fla. 1994), *aff'd as modified*, 58 F.3d 1573 (11th Cir. 1995); *Lemelle*, 18 F.3d at 1277 (holding that in order to have future claims dealt with in the bankruptcy "there must be evidence that would permit the debtor to identify, during the course of the bankruptcy proceedings, potential victims and thereby permit notice to these potential victims of the pendency of the proceedings").

### 3.      Notice and Due Process in Bankruptcy

As courts have long recognized, the requirement of "[n]otice is the cornerstone underpinning Bankruptcy Code procedure."  *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 (1st Cir. 1994).  Provisions that the bankruptcy court can take actions that affect parties' rights only "after notice and a hearing" appear throughout the Bankruptcy Code, including in the context of Section 363 sales.  *See, e.g.*, 11 U.S.C. 363(b) (trustee may sell property of the estate "after notice and a hearing"); 11 U.S.C. § 1128 ("After notice, the court shall hold a hearing on confirmation of a plan."); *cf.* 11 U.S.C. § 1109 ("A party in interest . . .  may raise and may appear and be heard on any issue in a case under this chapter.").  Generally speaking, "[i]nadequate notice is a defect which precludes discharge of a claim in bankruptcy."  *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995).

Courts have held in general that, for due process reasons, a party that did not receive adequate notice of bankruptcy proceedings could not be bound by orders issued during those proceedings.  In *In re John-Mansville Corp.*, 600 F.3d 135 (2d Cir. 2010), the Second Circuit rejected the argument that bankruptcy provides a special "remedial scheme" that creates an exception to the "principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."  *Id.* at 153-54 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999)).  As the court explained, the Supreme Court had previously held that "where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate preexisting rights," but only "*if the scheme is otherwise consistent with due process*."  *Id.* at 154 (quoting *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989) (emphasis added in Second Circuit opinion).  Because the claimant in *John-Mansville* "did not receive adequate notice" of

the Bankruptcy Court's orders, the claimant could not be bound by them.  *Id.* at 158; *see also Savage Indus.*, 43 F.3d at 721-22 (refusing to enjoin successor liability claim against firearm manufacturer despite "free and clear" provision in asset purchase agreement between debtor and purchaser because no attempt had been made to provide notice of the sale to potential claimants).

The notice requirements of bankruptcy law are "founded in fundamental notions of procedural due process."  *Savage Indus.*, 43 F.3d at 721; *see also Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) (holding that failure to give proper notice violates "the rudimentary demands of due process of law"); *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953) (stating in the bankruptcy context that "[t]he statutory command for notice embodies a basic principle of justice—that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights").  At its core, the concern is whether a claimant can be "force[d] . . . to be bound by proceedings in which he did not and could not participate."  *Kewanee Boiler Corp.*, 198 B.R. at 528-29.  It is well settled that in order for any proceeding to satisfy due process, there must be "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  *See also* 11 U.S.C. § 102(1) (defining "after notice and a hearing" as "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances"); *Savage Indus.*, 43 F.3d at 720 ("Under the Code . . . the debtor in possession or trustee must ensure 'parties in interest' adequate notice and opportunity to be heard *before* their interests may be adversely affected.").

Because parties holding future claims cannot possibly be identified and, thus, cannot be provided notice of the bankruptcy, courts consistently hold that, for due process reasons, their claims cannot be discharged by the bankruptcy courts' orders.  *See Lemelle*, 18 F.3d at 1277

(holding that plan of reorganization for mobile home manufacturer did not discharge claims against successor company for injury caused by mobile home manufactured prepetition); *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689, 709-10 (Bankr. D. Kan. 2006) (holding that state court action based on post-confirmation injury on amusement park manufactured prepetition was not discharged because "no effort" was made to give notice to potential future claimants, and even if claimant was deemed to have held a "claim" at the time of the bankruptcy, "the discharge of that claim without giving [him] reasonable notice and the opportunity to be heard on his claim violates due process"); *Kewanee Boiler Corp.*, 198 B.R. at 539 (holding that state court action against reorganized company based on injury from boiler manufactured prepetition could not be enjoined because claimant's "right to notice under bankruptcy law and the Constitution [was] not met").

### 4.      Notice and Due Process for Future Claims in Section 363 Sale Context

The cases provide somewhat less guidance regarding how these principle affect future claimants in the Section 363 sale context, although the same concerns pertain regardless of when the assets are sold, whether at confirmation or after a Section 363 sale.  The Second Circuit recently acknowledged these concerns, but declined to resolve them one way or the other.  In *In re Chrysler LLC*, the Second Circuit addressed objections to the Bankruptcy Court's approval of an order pursuant to Section 363.  That order authorized the sale of the car manufacturer's assets while extinguishing the right to pursue claims against the purchaser "on any theory of successor or transferee liability[,] whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated."  576 F.3d at 127. The court ruled that claimants with *existing* product liability claims against "Old Chrysler" (the debtor) could have their claims extinguished by the sale order, in part because "[t]o allow [those] claimants to assert successor liability claims against the purchaser while limiting other creditors'

recourse to the proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority scheme." *Id.* at 126 (quoting *Trans World Airlines*, 322 F.3d at 292) (quotation marks and brackets omitted).

However, the court declined to rule on whether the sale order could be enforced against "claimants who, although presently unknown and unidentified, might have claims in the future arising from Old Chrysler's production of vehicles." *Id.* at 123. The court affirmed the order itself "insofar as it constituted a valid exercise of authority under the Bankruptcy Code," but "decline[d] to delineate the scope of the bankruptcy court's authority to extinguish future claims, until such time as [the court is] presented with an actual claim for an injury that is caused by Old Chrysler, that occurs after the Sale, and that is cognizable under state successor liability law." *Id.* at 127.

Other courts, when presented with future claims in the context of Section 363 sale orders, have held that the claims cannot be extinguished without due process for the future claimants. In *Schwinn Cycling & Fitness Inc. v. Benonis*, 217 B.R. 790 (N.D. Ill. 1997), a manufacturer of bicycles and exercise equipment declared bankruptcy. During the course of the proceedings, most of the debtor's assets were sold pursuant to an order under Section 363, approving an agreement that the purchaser did not assume any liability for conduct of the debtor's business prior to the closing of the sale. Sometime after the reorganization plan was confirmed, an individual using equipment manufactured by the debtor was injured and (along with members of his family) brought suit in state court, seeking to impose successor liability under state law on the purchaser of the assets. The purchaser ("New Schwinn") brought an adversary action in the bankruptcy court to enjoin the state court action.

The court concluded that the finding in the sale order that New Schwinn was not a "successor in interest" to the debtor was "directed at forcing existing pre-confirmation personal

injury claimants to bring such claims against [estate assets].  It was not intended to, *nor could it*, preempt all possible future successor liability claims."  *Id.* at 796-97 (emphasis added).  In any event, the court held, because the plaintiffs in the state court action did not receive notice of the sale or bankruptcy proceedings, their claim could not have been extinguished by the sale order.  *Id.* at 797.  In the court's view, to enjoin the plaintiffs' state court action "would, in effect, deny them of their rights to due process."  *Id.*  The court noted that the fact "[t]hat there existed no notice reasonably calculated to reach parties like [the plaintiffs] does not lessen the due process implications of New Schwinn's contentions in the adversary proceeding."  *Id.*

### D.    Application to this Case

The "free and clear" provisions of the Section 363 Sale Order in this case are broader than those of the confirmation plans analyzed in some of the other cases dealing with future claims.  The Sale Order expressly purports to extinguish any "claims for successor or vicarious liability, by reason of [the] transfer [of the Lot 2 Assets] under the laws of the United States, any state, territory or possession thereof or the District of Columbia applicable to such transactions." (Sale Order ¶ 19.)  On its face, this would encompass the theory of successor liability set forth by New Jersey state courts.  The case thus does not turn directly on how to define the term "claim" in the Bankruptcy Court's orders.  Nevertheless, the due process and notice concerns that underlie the decisions discussed above are fully applicable here.

The Fredericos did not receive adequate notice of their potential claim in the Grumman bankruptcy proceedings because, at the time of the bankruptcy, there was no way for anyone to know that the Fredericos ever would have a claim.  Enforcing the Sale Order against the Fredericos to take away their right to seek redress under a state law theory of successor liability when they did not have notice or an opportunity to participate in the proceedings that resulted in that order would deprive them of due process.  *See Schwinn*, 217 B.R. at 797 ("Allowing the

provisions of the Bankruptcy Court's orders to limit the rights of injured parties . . . who had no notice, and no reason at the time, to present an interest in the bankruptcy proceedings or to take action in response to the threatened deprivation of their rights, would violate due process and bankruptcy notice concerns.").

Morgan does not grapple directly with the due process argument in its briefs, preferring instead to focus on the idea that policies underlying the bankruptcy code preempt state successor liability law.  Morgan points out that under New Jersey law, a purchaser of assets in a Section 363 sale could be subject to decades of uncertainty about when some claimant may come forward, suing Morgan for conduct based on conduct by a totally different entity.  As Morgan points out, the *Lefever* court acknowledged this potential unfairness, but expressed that "competent counsel" could effectively advise a "prudent purchaser" about the risks of potential successor liability down the line.  160 N.J. at 324.  According to Morgan, any "competent counsel" would advise the client not to pay as much for the assets.  This, Morgan argues, would necessarily violate the Bankruptcy Code's policy of maximizing the value of the estate.

A recent summary order from the Second Circuit appears to lend support to Morgan's argument.  In *Douglas v. Stamco*, 363 F. App'x 100, the court affirmed the dismissal of a complaint for failure to adequately plead successor liability against the purchaser of assets in a bankruptcy sale.  The court noted that allowing the plaintiff to proceed with his tort claim against the purchaser "would be inconsistent with the Bankruptcy Code's priority scheme because plaintiff's claim is otherwise a low-priority unsecured claim."  *Id.* at 102.  The court went on to observe that

> to the extent that the 'free and clear' nature of the sale . . . was a crucial inducement in the sale's successful transaction, it is evident that the potential chilling effect of allowing a tort claim subsequent to the sale would run counter to a core aim of the Bankruptcy

>Code, which is to maximize the value of the assets and thereby
>maximize potential recovery to the creditors.

*Id.* at 102-03 (citations omitted).

However, as the Bankruptcy Court in this case explained, the Second Circuit was not presented with, and did not consider, due process issues or whether the plaintiff in the case had a "claim" that could have been dealt with in the bankruptcy proceedings. Moreover, the action was not to enjoin a state lawsuit. Rather, the case had been removed to federal court and the district court held that the plaintiff had failed to plead a valid basis for successor liability under applicable law. Here, the Court is not addressing whether the Fredericos will ultimately be able to sustain their successor liability claim; the question is whether the Sale Order prevents them from even bringing the suit in the first place. In light of the due process problems that would result from such an interpretation, the Court holds that the Sale Order cannot be enforced in this manner.

An additional point bears noting: Some courts deal with the issue of future claims by appointing a future claims representative to advocate for the interests of future claimants. The future claims representative can negotiate for the creation of special trusts where funds may be set aside to pay claims that will be asserted for injuries caused by prepetition conduct that do not occur until after the bankruptcy closes. This is often particularly useful in mass tort cases, such as those involving asbestos or medical implants, where a discernible class of potential claimants has already been exposed to the product, and it is only a question of when (and to what extent) harm will manifest itself. *See, e.g., Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198 (4th Cir. 1988) (employing representative for class of individuals who used intrauterine device); *see generally Kewanee Boiler Corp.*, 198 B.R. at 540 ("In all cases found where a trust was created out of which future claims against the estate were to be paid, some assertedly injurious contact between

the future victim and the product occurred pre-petition.  Only the manifestation of a disease was lacking.  In those cases, the existence of pre-petition physical contact, such as inhalation of asbestos, or insertion of a contraceptive, or implantation of a breast implant, more or less fixed the class of potential victims." (internal citations omitted)).  In fact, the Bankruptcy Code sets forth a specific procedure for representation of claims on behalf of people exposed to asbestos. *See* 11 U.S.C. § 524(g).

On the other hand, courts faced with future claimants like those in this case—in essence, the unknown future claimants of the *Chateaugay* "bridge" hypothetical—often reject efforts by future claims representatives to submit those "claims" for approval.  For example, in *Piper*, the Eleventh Circuit rejected the efforts of a future claims representative to set aside funds for people who would be injured after the bankruptcy by airplanes manufactured by the debtor.  The representative based his calculation on "statistical assumptions regarding the number of persons likely to suffer, after the confirmation of a reorganization plan, personal injury or property damage caused by Piper's pre-confirmation manufacture, sale, design, distribution or support of aircraft and spare parts."  58 F.3d at 1575.  The court set forth, and then applied, the *Piper* test to find that these hypothetical future claimants did not have sufficient pre-confirmation relationships with the debtor for them to hold "claims" that could be adjudicated in the bankruptcy.  *See also Hoffinger*, 307 B.R. at 121-22 (applying *Piper* test to reject efforts to resolve future claims against swimming pool manufacturer because "[t]he post confirmation person unknown, unborn, or about to take their first swimming lesson simply does not have a logical prepetition nexus to Hoffinger's products" that would allow due process to be satisfied if their claims were resolved in the bankruptcy).

The Fredericos point out that their due process rights would be violated because not only did they not receive notice of the bankruptcy, but there was no future claims representative or

any provisions made for future claimants.  Morgan pointed out at oral argument that under cases like *Piper*, there likely could not have been a future claims representative who could have represented claimants such as the Fredericos.  The Court does not express a view on whether a future claims representative would have been appropriate or permissible in this case.  Either way, the fact remains that there was not a future claims representative in this case, or any provisions made for  unrepresented future claimants.  Thus, the Fredericos (and other future claimants in their position) were not afforded either the notice and opportunity to participate in the proceedings or representation in the proceedings that due process would require in order for them to be bound by the Bankruptcy Court's orders.

The Court is certainly cognizant of the inherent uncertainty that allowing successor liability claims (notwithstanding the "free and clear" provisions of a bankruptcy court's orders) imposes upon purchasers of debtor assets in a bankruptcy.  However, to whatever extent maximizing the value of the estate is an important policy of the Bankruptcy Code, it is no more fundamental than giving claimants proper notice and opportunity to be heard before their rights are affected, to say nothing of constitutional requirements of due process.

Courts have rejected the premise that maximizing the value of the estate outweighs the due process rights of potential claimants.  In a slightly different context, in response to the argument that "the price received in a bankruptcy sale will be lower if a court is free to disregard a condition in the sale agreement enjoining claims against the purchaser based on the sellers' misconduct," the Seventh Circuit stated that though this is true, it "proves too much":

> It implies, what no one believes, that by virtue of the arising-under jurisdiction a bankruptcy court enjoys a blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale in order to maximize the sale price: more, that the court could in effect immunize such buyers from all state and federal laws that might reduce the value of the assets bought from the bankrupt; in effect, that it could discharge the debts of nondebtors . . . as well as of

> debtors even if the creditors did not consent; that it could allow the
> parties to bankruptcy sales to extinguish the rights of third parties,
> here future tort claimants, without notice to them or (as notice
> might well be infeasible) any consideration of their interests.  If the
> court could do all these nice things the result would indeed be to
> make the property of bankrupts more valuable than other
> property—more valuable to the creditors, of course, but also to the
> debtor's shareholders and managers to the extent that the strategic
> position of the debtor in possession in a reorganization enables the
> debtor's owners and managers to benefit from bankruptcy.  But the
> result would not only be harm to third parties, such as the
> [claimants in the case], but also a further incentive to enter
> bankruptcy for reasons that have nothing to do with the purposes
> of bankruptcy law.

*Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 163 (7th Cir. 1994) (Posner, J.).  *See also*

*Savage Indus.*, 43 F.3d at 722-23 (in case where claimant did not receive adequate notice of asset

sale, rejecting argument that refusing to enforce "free and clear" provision of asset purchase

agreement would "'chill' chapter 11 asset bidding").

The Court does not decide whether or not there may be circumstances under which a

Section 363 sale order could extinguish the claims of future claimants who, because they were

not injured before the close of the bankruptcy, had no way to receive notice of the bankruptcy

proceedings.  And the Court does not reach any conclusion regarding whether use of a future

claims representative can always address the due process concerns of unknown future claimants,

nor whether use of such a representative would have been possible or appropriate in the

bankruptcy proceedings here.  Finally, as previously stated, the Court does not reach the question

whether Morgan actually is liable as a successor to Grumman under New Jersey law.  The Court

holds only that, under the circumstances presented in this case, to enforce the Sale Order to

enjoin the Fredericos' state law suit would deny them due process and violate the Bankruptcy

Code's requirements of notice and opportunity to be heard for those affected by a bankruptcy

court's rulings.  Thus, the Court agrees with the Bankruptcy Court that the Fredericos are entitled

to judgment as a matter of law, and Morgan's adversary complaint should be dismissed.

**Conclusion**

For the foregoing reasons, this Court AFFIRMS the Bankruptcy Court's judgment

entered February 25, 2011.

 SO ORDERED

Dated: New York, New York
       March 29, 2012

_____
                J. PAUL OETKEN
           United States District Judge